Opinion to: SJR TGT SN TJ EVK ERA GCH LCH JB







Opinion issued November 23, 2005













     






In The
Court of Appeals
For The
First District of Texas








NO. 01-04-01088-CV








UNIVERSAL COMPUTER SYSTEMS, INC., UNIVERSAL COMPUTER
CONSULTING, LTD., UNIVERSAL COMPUTER SERVICES, INC., AND
DEALER COMPUTER SERVICES, INC., Appellants

V.

DEALER SOLUTIONS, L.L.C., DEALER SOLUTIONS HOLDINGS, INC.,
ADP, INC., SMC INVESTMENT, INC. f/k/a SWT INVESTMENTS, INC.,
SOUTHWEST TOYOTA, INC. d/b/a STERLING MCCALL TOYOTA, SMC
LUXURY CARS, INC. d/b/a STERLING MCCALL LEXUS, AND
BUSINESS SOLUTIONS, INC., Appellees

* * *

ADP, INC., Cross-Appellant

V. 

UNIVERSAL COMPUTER SYSTEMS, INC., Cross-Appellee








On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Cause No. 99-11466









O P I N I O N
          The parties in this trade secrets case agreed to arbitrate their claims against
each other, and did so, but not before a lengthy discovery battle in the trial court. 
The trial court confirmed the arbitrators’ decision, from which the losing parties
appeal. Appellate review of the confirmation of arbitration decisions is very
limited, as such decisions are meant to be final in all but exceptional cases. We
hold that the facts presented here are not exceptional under the applicable caselaw. 
We further hold that the trial court should not have issued a discovery order
limiting the presentation of certain evidence before the arbitrators, but the
arbitrators allowed the evidence and considered it in any event, thus ameliorating
any harm. We therefore affirm the trial court’s confirmation of the arbitrators’
decision.
          Appellants Universal Computer Systems, Inc., Universal Computer
Consulting, Ltd., Universal Computer Services, Inc., and Dealer Computer
Services, Inc. (collectively “UCS”) appeal the judgment confirming an arbitration
award in favor of appellees Dealer Solutions, L.L.C., Dealer Solutions Holdings,
Inc. (collectively “DSI”), SMC Investment, Inc. f/k/a SWT Investments, Inc.,
Southwest Toyota, Inc. d/b/a Sterling McCall Toyota, SMC Luxury Cars, Inc. d/b/a
Sterling McCall Lexus (collectively “Sterling McCall”), and Business Solutions,
Inc. (“BSI”), and cross-appellant ADP, Inc. (“ADP”). UCS contends that (1) the
trial court had no authority to enter an order defining the scope of UCS’s trade
secrets claim to be heard at the arbitration hearing; (2) the trial court abused its
discretion by imposing this discovery sanction before sending the case to
arbitration; and (3) the arbitrators’ decision is a gross mistake because the
arbitrators (a) ignored the plain and unambiguous language of a license agreement
between UCS and Sterling McCall, (b) failed to recognize three Texas cases
involving trade secret waiver, (c) found that DSI did not use UCS’s trade secrets,
(d) failed to recognize disgorgement damages, and (e) found that UCS’s trade
secret misappropriation claim is preempted by federal copyright law. In its cross-appeal, ADP asserts that, although the arbitrators correctly decided the preemption
issue, should we decide otherwise, then ADP is entitled to injunctive relief.
Factual and Procedural Background
          UCS provides computer systems to car dealerships. In 1985, UCS
contracted to license software to Sterling McCall. The contract required Sterling
McCall to keep confidential “the programs and software” covered under the
agreement. The contract also contained a provision requiring arbitration of “any
claim, grievance, or controversy between customer and UCS . . . arising out of this
agreement[.]”
          In 1994, Sterling McCall and BSI, a software consulting firm, contracted to
develop a dealer management computer system called “CARMan” to replace
Sterling McCall’s existing UCS system. The following year, Sterling McCall and
BSI formed another entity, DSI, to continue developing the CARMan system. DSI
employees had offices at the Sterling McCall body shop and had access to the UCS
computer system. In early 1997, DSI displayed CARMan at the National
Automobile Dealers Association annual convention. ADP acquired DSI in early
1999.
          UCS sued in March 1999, alleging that appellees misappropriated UCS’s
trade secrets by accessing the UCS software at Sterling McCall to assist in
designing and perfecting CARMan. In addition, UCS alleged that Sterling McCall
breached the confidentiality provision of its license agreement with UCS. ADP
counterclaimed for misappropriation of trade secrets against UCS, alleging that
UCS obtained ADP’s software without permission and used it to develop
competing products.
The Discovery Dispute
          In April 1999, DSI propounded interrogatories to UCS asking it to identify
each trade secret it contended DSI had misappropriated. UCS responded by
naming its various software applications and programs. Dissatisfied with UCS’s
response, DSI moved to compel UCS to supplement its answers to the
interrogatories with information specifically identifying the trade secrets DSI
allegedly misappropriated. Pursuant to the recommendation of the special master
appointed by the trial court to handle discovery disputes, the court granted DSI’s
motion to compel.
          UCS filed a supplemental response in which it clarified that DSI and BSI
allegedly “accessed every UCS software application used at [Sterling McCall,]” all
of which UCS provided on a confidential basis. Still dissatisfied with UCS’s
response, DSI filed a second motion to compel. Pursuant to the special master’s
recommendation, the trial court granted DSI’s second motion to compel,


 stayed all
discovery by UCS, and ordered UCS to pay DSI $250 in attorney’s fees.
          In its second supplemental response, UCS clarified that DSI allegedly had
“misappropriated the architecture, structure, and design” of the overall UCS
computer system at Sterling McCall, as well as the individual application
packages. DSI filed another motion to compel, asserting that UCS’s response
“failed to specifically identify a single trade secret that UCS might have.” On June
15, 2000, the trial court, on recommendation of the special master, once again
granted DSI’s motion to compel. Specifically, the court ordered UCS to
supplement its response as follows:
          [UCS] shall amend [its] answers to Defendants’ First Set of
Interrogatories . . . to specifically and separately identify, as [it] ha[s]
heretofore failed to do, . . . each particular process, formula, pattern,
device, compilation of information, or other matter that is the subject
of this case that [UCS] contend[s] is a trade secret accessed or
misappropriated by [appellees], by separately stating each such trade
secret and describing the nature, subject matter, and details of each
such trade secret with sufficient particularity to show its unique and
secret nature to separate it from the general knowledge of those
involved in automobile dealership management and the specific
knowledge of those skilled in automobile dealership management
systems.
 
. . . .
 
          If [UCS] claim[s] that the overall “structure, architecture and
design of its computer system as a whole” is a trade secret
misappropriated by [appellees], [UCS] shall specifically identify such
system as a trade secret and describe with sufficient particularity how
its’ [sic] combination of identified trade secret and non-trade secret
characteristics, features functionalities and components interact and
work together, and are adapted, implemented, integrated and applied
to form a whole unified process, design and operation which is unique
and secret in combination and which separates it from the general
knowledge of those involved in automobile dealership management
and specific knowledge of those skilled in automobile dealership
management systems.
 
The trial court also continued the discovery stay against UCS and ordered it to pay
DSI $500 in attorney’s fees.
          UCS moved to set aside the trial court’s June 15, 2000 order. The trial court
held an evidentiary hearing on UCS’s objection on July 10–11, 2000, and UCS
supplemented its response for a third time on July 14, 2000. In its third
supplemental response, UCS stated that
DSI misappropriated the architecture, structure, and design of
the UCS computer system as a whole. . . . UCS’ unique combination
of features and functions into a unified and integrated computer
system, and the way those components fit together to form the unique
whole, was a protectable trade secret that was misappropriated by
DSI.
 
Along with its third supplemental response, UCS also filed a proposed order
referring the case to arbitration. In a letter dated July 14, 2000, DSI objected to
UCS’s third supplemental response, but advised the trial court that the parties had
agreed to the entry of an order referring the case to arbitration.
          The trial court held another hearing on August 7, 2000, at which time it
upheld its June 15, 2000 order and advised UCS that it would be required to file a
fourth supplemental response by September 18, 2000. The trial judge also
informed the parties that he would grant their agreed order to arbitrate, but would
not sign it until October 2, 2000.
          UCS filed its fourth supplemental response on September 18, 2000 and
attached thousands of pages of information describing how the UCS software
works.


 DSI requested and set a hearing for October 16, 2000 concerning the trial
court’s anticipated entry of the agreed order to arbitrate. DSI then filed a motion to
dismiss for discovery abuse based on UCS’s alleged failure to identify a single
trade secret.
          The trial court signed the agreed order to arbitrate on October 2, 2000. One
week later, DSI moved to set aside the arbitration order pending resolution of its
motion to dismiss. The trial court granted DSI’s motion, withdrew the arbitration
order, and ordered that the agreed order to arbitrate would “be enforced at a future
date.”
          On January 25, 2001, the trial court entered an order on DSI’s motion to
dismiss, finding that although UCS had failed to adequately answer the
interrogatories, sanctions were not yet justified. Instead, the court “established a
presumption of the non-existence of any trade secret . . . claimed by [UCS], subject
to [UCS] being required during the next 30 days to adequately answer such
interrogatories as directed and to rebut the presumptions of the non-existence of
trade secrets[.]” The court also observed that “[UCS] ha[s] stipulated that the only
trade secret being claimed by [it] in th[is] action is the overall structure,
architecture and design of its computer system as a whole and not any individual
process, formula, pattern, device or compilation of information or other matter.”
          UCS filed its fifth supplemental response on February 21, 2001, asserting
that its data fields, “unique combination of functionality of [its] software
programs[,]” overall structure and architecture of its software programs, unique
formats of the reports generated by its software, and “combination of reporting
functionality” are all trade secrets. DSI subsequently filed a second motion to
dismiss for discovery abuse based on UCS’s alleged refusal to specifically describe
any trade secret.
          On December 10, 2001, pursuant to the special master’s recommendation,
the trial court denied DSI’s second motion to dismiss, but ordered that “[UCS]’s
evidence in support of its claim that its automobile dealership management
software system is a trade secret shall be limited to its proof set forth in its
responses and supplemental responses to interrogatories submitted to [appellees]
prior to September 1, 2001.” Two days later, UCS again moved to compel
arbitration. DSI responded that, before ruling on the motion to compel arbitration,
the trial court should clarify the evidentiary limitation imposed in its December 10,
2001 order.
          After holding a hearing, the trial court granted in part and denied in part the
motion to compel arbitration and ordered as follows:
All parties and all claims alleged in this case shall be referred to
arbitration for the resolution of such claims. However, the Court’s
order referring this matter to arbitration will be entered by the Court
only after (1) [appellees] have an opportunity to seek clarification of
the December 10, 2001 Order denying Defendants’ Second Motion to
dismiss for Discovery Abuse from the Special Master . . ., and (2) all
parties have had an opportunity to object to the Special Master’s order
and obtain a ruling on such objections by the Court.
 
UCS filed a petition for a writ of mandamus in this Court, complaining of the trial
judge’s partial denial of its motion to compel arbitration. In re Universal
Computer Sys., Inc., No. 01-02-00343-CV, 2002 WL 538978, at *1 (Tex.
App.—Houston [1st Dist.] Apr. 8, 2002, orig. proceeding) (not designated for
publication). We declined to grant mandamus relief. Id.
          On May 9, 2002, the trial court clarified its December 10, 2001 order as
follows:
[UCS] ha[s] stipulated that the only trade secret being claimed by [it]
in [its] action is the overall structure, architecture and design of [its]
computer system as a whole and not any individual process, formula,
pattern, device or compilation of information or other matter.
 
[UCS’s] evidence identifying and describing [its] claimed trade secret
shall be limited to [its] interrogatory responses served on February 21,
2001, which [UCS] ha[s] stipulated are a complete description of [its]
claimed trade secret.
 
With these orders in hand, the parties proceeded to arbitration.
The Arbitration
          A panel of three arbitrators conducted the arbitration hearing, which lasted
three weeks.


 After noting UCS’s stipulation regarding the theory of its case set
forth in the trial court’s January 25, 2001 order, the arbitrators initially decided to
“follow the [c]ourt’s order,” and “hold [UCS] to its burden of structure,
architecture, and design.” However, when DSI objected that UCS’s evidence
exceeded its February 21, 2001 interrogatory responses, the arbitrators allowed the
evidence and decided to carry the issue with the case.


 Thereafter, on numerous
occasions, the arbitrators declined to limit the testimony or introduction of
evidence by UCS based on the trial court’s May 9, 2002 order. UCS proceeded to
put on nearly two weeks of testimony, followed by one week of testimony from
appellees.
          The arbitrators issued their corrected decision on November 25, 2003. A
majority of the panel found as follows:
          Under the Order of May 9, 2002, the only trade secret claimed
by UCS is the overall structure, architecture and design of its
computer system as a whole and not any individual process, formula,
pattern, device or compilation of information or other matter. May 9,
2002 Order. UCS’s evidence identifying and describing the claimed
trade secret is limited to its interrogatory responses served on
February 21, 2001. . . . Because UCS’s February 21, 2001
interrogatory responses do not in fact describe overall structure,
architecture and design of the UCS computer system as a whole, UCS
is barred from proving the necessary element of a claim for
misappropriation of trade secrets.
 
          Even if UCS’s evidence describing its alleged trade secret were
not limited to UCS’s February 21 Responses, UCS’s evidence at trial
demonstrated, at most, that some defendants obtained from the UCS
system a partial list of UCS data fields, features, and functionalities. 
These do not constitute the overall architecture, structure, and design
of the UCS system as a whole. Furthermore, in light of the unrebutted
direct evidence of the substantial differences between CARMan and
UCS, the circumstantial evidence presented by UCS as to
misappropriation and use does not meet UCS’ burden to prove these
elements by a preponderance of the evidence.
 
          UCS has failed to establish the existence of a trade secret other
than its code, which was not misappropriated by defendants.
 
          A majority of the panel also decided that, even though it was “unnecessary”
to reach the copyright preemption issue, given the majority’s finding that UCS had
failed to prove its trade secret misappropriation claim, the panel would decide the
issue because the parties had extensively briefed it. Relying on Texas caselaw,


 a
majority of the arbitration panel concluded that federal copyright law preempted
UCS’s claim for misappropriation of trade secrets.
          With respect to ADP’s counterclaim, a majority of the panel found that UCS
misappropriated ADP’s trade secret object code, but ADP’s misappropriation claim
similarly was preempted. The panel majority noted that, “[i]f this legal conclusion
[regarding preemption] is incorrect, ADP would be entitled to an injunction
prohibiting UCS from running ADP’s code from the UCS offices either by way of
a dial-up modem or on a system it has misappropriated, or by any other means.”
          Following the arbitration proceeding, DSI and ADP moved to confirm the
arbitration award,


 while UCS moved to vacate the award. The trial court
confirmed the arbitration award on December 30, 2003.
Analysis
Pre-Arbitration Orders
          UCS contends that the trial court abused its discretion by not sending the
case immediately to arbitration and by seeking to limit the evidence UCS could
introduce at the arbitration hearing through discovery orders entered after the case
should have been sent to arbitration. UCS characterizes the trial court’s May 9,
2002 order restricting the evidence UCS could introduce at the arbitration hearing
as an improper death-penalty sanction.
          “Once a party seeking to compel arbitration establishes that an agreement [to
arbitrate] exists . . ., and that the claims raised are within the agreement’s scope,
the trial court has no discretion but to compel arbitration and stay its proceedings
pending arbitration.” Cantella & Co. v. Goodwin, 924 S.W.2d 943, 944 (Tex.
1996) (orig. proceeding) (quotation omitted); see also Pepe Int’l Dev. Co. v. Pub
Brewing Co., 915 S.W.2d 925, 929 (Tex. App.—Houston [1st Dist.] 1996, no writ)
(“If the court finds the arbitration provision valid, it shall order arbitration.”); In re
Jebbia, 26 S.W.3d 753, 757 (Tex. App.—Houston [14th Dist.] 2000, orig.
proceeding) (“If the movant has proven there is an arbitration agreement, as a
matter of law, the court must compel arbitration, and a presumption arises that all
disputed issues between the parties must be arbitrated.”). Furthermore,
in deciding whether the parties have agreed to submit a particular
grievance to arbitration, a court is not to rule on the potential merits of
the underlying claims. Whether “arguable” or not, indeed even if it
appears to the court to be frivolous, the [party’]s claim . . . is to be
decided, not by the court asked to order arbitration, but as the parties
have agreed, by the arbitrator. “The courts, therefore, have no
business weighing the merits of the grievance, considering whether
there is equity in a particular claim, or determining whether there is
particular language in the written instrument which will support the
claim. The agreement is to submit all grievances to arbitration, not
merely those which the court will deem meritorious.”
 
AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 649–50, 106
S. Ct. 1415, 1419 (1986) (quoting United Steelworkers v. Am. Mfg. Co., 363 U.S.
564, 568, 80 S. Ct. 1343, 1346 (1960)).
  Thus, once the parties presented the agreed order to compel arbitration and
UCS moved to compel arbitration, the trial court should not have delayed in
referring the case to arbitration to undertake further discovery matters and to enter
orders attempting to curtail the proceedings before the arbitrators as a result of its
discovery rulings. See John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557,
84 S. Ct. 909, 918 (1964) (“‘[P]rocedural’ questions which grow out of the dispute
and bear on its final disposition should be left to the arbitrator.”).



Both the record and the arbitrators’ decision reflect, however, that
notwithstanding the trial court’s order, the arbitrators ultimately considered all of
UCS’s evidence—not just the matters set forth in its interrogatory responses. In
particular, although DSI objected that UCS’s presentation of evidence to the
arbitration panel exceeded the scope of its February 21, 2001 interrogatory
responses, in contravention of the trial court’s May 9, 2002 order, the arbitrators
allowed UCS to adduce two weeks of testimony. UCS neither contended that it
had additional evidence to present nor objected that the arbitrators had precluded it
from introducing any further evidence because of the trial court’s order. Moreover,
UCS did not argue in closing that its ability to present evidence was restricted.



The arbitration panel majority made extensive findings of fact. It then
presented alternative grounds to support its judgment. First, it concluded that the
trial court’s order kept UCS from raising the evidence to support a trade secret
misappropriation claim. Second, the panel concluded that appellees did not
misappropriate trade secrets, after considering all of UCS’s evidence:
Even if UCS’s evidence describing its alleged trade secret were
not limited to UCS’s February 21 Responses, UCS’s evidence at trial
demonstrated, at most, that some defendants obtained from the UCS
system a partial list of UCS data fields, features, and functionalities. 
These do not constitute the overall architecture, structure, and design
of the UCS system as a whole. Furthermore, in light of the unrebutted
direct evidence of the substantial differences between CARMan and
UCS, the circumstantial evidence presented by UCS as to
misappropriation and use does not meet UCS’ burden to prove these
elements by a preponderance of the evidence.
 
We therefore hold that UCS has not shown that the trial court’s May 9, 2002
order probably caused the rendition of an improper judgment, because the
arbitration panel majority alternatively concluded that UCS did not meet its burden
based upon the evidence. See Tex. R. App. P. 44.1(a)(1) (“No judgment may be
reversed on appeal on the ground that the trial court made an error of law unless
the court of appeals concludes that the error complained of probably caused the
rendition of an improper judgment[.]”).
The Arbitration Decision
          UCS contends that the arbitrators made a gross mistake by (1) ignoring the
plain and unambiguous language of the license agreement between UCS and
Sterling McCall, (2) failing to address three Texas cases involving trade secret
waiver, (3) finding that DSI did not use UCS’s trade secrets, (4) failing to
recognize disgorgement damages, and (5) finding that UCS’s trade secret
misappropriation claim is preempted by federal copyright law. Appellees respond
that because the parties agreed the Texas General Arbitration Act


 governs this
arbitration, the Texas common law “gross mistake” standard is inapplicable. 
Rather, appellees assert, UCS is confined to raising one or more of the four
exclusive grounds for vacatur set forth in the Texas General Arbitration Act.
          We agree that the Texas General Arbitration Act governs this dispute. 
Although the arbitration provision contained in the license agreement between
UCS and Sterling McCall does not reference the Texas General Arbitration Act,



the parties’ subsequent Agreed Order to Stay Action and Compel Arbitration
specifically incorporates it:
The final arbitration award shall be subject to appeal, by way of
a motion to modify, correct or vacate all or any part of the award filed
in this Court and, thereafter, to the courts of appeals having
jurisdiction, pursuant to the Texas General Arbitration Act.
 
To the extent not addressed herein, the rules of the Texas
General Arbitration Act shall govern the arbitration.
 
We therefore conduct our review under the Texas General Arbitration Act.
          Pursuant to the Texas General Arbitration Act, a court may vacate an
arbitration award under only four circumstances: (1) “the award was obtained by
corruption, fraud, or other undue means;” (2) there was evident partiality,
corruption, or willful misconduct by an arbitrator that prejudiced the rights of a
party; (3) the arbitrators exceeded their powers, refused to postpone the hearing on
good cause shown, refused to hear material evidence, or conducted the hearing in a
substantially prejudicial manner; or (4) “there was no agreement to arbitrate, the
issue was not adversely determined in a proceeding under Subchapter B, and the
party did not participate in the arbitration hearing without raising the objection.”


 
Tex. Civ. Prac. & Rem. Code Ann. § 171.088(a)(1)–(4) (Vernon 2005). UCS
does not contend any of these circumstances apply to this arbitration proceeding.
          Appellees urge that UCS is limited to these statutory grounds for vacatur,
and thus UCS’s appeal is without merit. We note, however, that the Texas
Supreme Court recently declined an invitation to hold that a party governed by the
Texas General Arbitration Act is limited to the statutory grounds for vacatur and
cannot rely upon the common law “gross mistake” standard. Callahan & Assocs.
v. Orangefield Indep. Sch. Dist., 92 S.W.3d 841, 844 (Tex. 2002). After observing
that “[n]either party disputes that the [Texas General Arbitration] Act governs the
contract[,]” and “[t]he statutory grounds allowing a court to vacate . . . an award
are limited to those the Act expressly identifies[,]” the Texas Supreme Court
“assume[d] without deciding that [petitioner] may rely on the gross mistake
standard under the common law to attack the arbitrator’s award[.]” Id. Thus, like
the Texas Supreme Court, we assume without deciding that UCS may rely on the
common law gross mistake standard in this case in seeking to set aside the trial
court’s confirmation of the arbitrators’ decision.
          Yet, our review of an arbitration decision is “extremely narrow” because
Texas law favors arbitration. IPCO-G.&C. Joint Venture v. A.B. Chance Co., 65
S.W.3d 252, 256 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). An
arbitration award has the same effect as the judgment of a court of last resort,


 and
a reviewing court may not substitute its judgment for that of the arbitrators merely
because it would have reached a different result. J.J. Gregory Gourmet Servs., Inc.
v. Antone’s Imp. Co., 927 S.W.2d 31, 33 (Tex. App.—Houston [1st Dist.] 1995, no
writ). Because arbitration is favored as a means of dispute resolution, every
reasonable presumption must be indulged to uphold the arbitrators’ decision, and
none is indulged against it. CVN Group, Inc. v. Delgado, 95 S.W.3d 234, 238
(Tex. 2002). Review is so limited that a court may not vacate an arbitration award
even if it is based upon a mistake of fact or law. Vernon E. Faulconer, Inc. v. HFI
Ltd. P’ship, 970 S.W.2d 36, 39 (Tex. App.—Tyler 1998, no pet.) (citing Jamison
& Harris v. Nat’l Loan Investors, 939 S.W.2d 735, 737 (Tex. App.—Houston
[14th Dist.] 1997, writ denied)).
          Texas common law allows a reviewing court to set aside an arbitration
award “only if the decision is tainted with fraud, misconduct, or gross mistake as
would imply bad faith and failure to exercise honest judgment.” IPCO, 65 S.W.3d
at 256 (quoting Teleometrics Int’l, Inc. v. Hall, 922 S.W.2d 189, 193 (Tex.
App—Houston [1st Dist.] 1995, writ denied)). “Gross mistake results in a decision
that is arbitrary or capricious. An honest judgment made after due consideration
given to conflicting claims, however erroneous, is not arbitrary or capricious.” 
Bailey & Williams v. Westfall, 727 S.W.2d 86, 90 (Tex. App.—Dallas 1987, writ
ref’d n.r.e.). The party seeking to vacate an arbitration award has the burden of
demonstrating how the arbitrators made a gross mistake. Anzilotti v. Gene D.
Liggin, Inc., 899 S.W.2d 264, 267 (Tex. App.—Houston [14th Dist.] 1995, no
writ).
          UCS asserts that the arbitrators made a gross mistake for several reasons. 
First, UCS contends that the panel majority improperly ignored the license
agreement between UCS and Sterling McCall as a whole, and instead adopted a
“strained interpretation” that parsed out the individual phrases “software,”
“program,” and “licensed copy” as including only the raw code. UCS insists that
this interpretation cannot be squared with the purpose of the agreement—which
was to keep the programs, software, and manifestations of the software
confidential—and is “sufficiently absurd” to justify vacatur of the award. 
Appellees respond that the arbitration panel heard evidence, and properly found,
that UCS publicly disclosed (1) the functionality of the UCS system, (2) the data
items the UCS system uses to perform its operations, (3) the manuals describing
how the UCS system operates, (4) the screens displayed on the end user’s terminal
on the UCS system, and (5) the reports or output from the UCS system. Thus,
appellees contend, the panel majority properly interpreted the license agreement
narrowly.
It is not our province to determine the proper construction of the parties’
license agreement. See House Grain Co. v. Obst, 659 S.W.2d 903, 907 (Tex.
App.—Corpus Christi 1983, writ ref’d n.r.e.) (holding that “[i]t is not necessary for
us to determine the proper construction of the contract between the parties”
because to do so would allow the parties “to essentially relitigate the arbitration
proceedings”). Instead, our review is limited to whether the arbitrators’ failure to
adopt UCS’s interpretation of the license agreement constitutes bad faith or a
failure to exercise honest judgment. The record contains conflicting evidence as to
the interpretation and breach of the agreement. Thus, nothing before us suggests
that the arbitrators acted in bad faith or failed to exercise honest judgment, both
with respect to UCS’s claim for misappropriation of trade secrets and its claim for
breach of contract against Sterling McCall. We hold UCS’s first ground for
vacating the award to be without merit.
          Next, UCS asserts that the arbitrators made a gross mistake by failing to
address three leading Texas cases regarding trade secret waiver.


 According to
UCS, the panel majority incorrectly found that UCS lost any trade secret protection
by demonstrating the UCS system and distributing software overviews to
thousands of third parties without expressly obligating the third parties to maintain
confidentiality. UCS also contends the arbitrators’ finding that DSI did not use
UCS’s trade secrets because the DSI software is not a copy of the UCS system is a
“gross distortion of well-settled law[.]” However, “[t]hese alleged errors in the
application of substantive law by the arbitrators during the proceedings in
arbitration are not reviewable by the court on a motion to vacate an award.” 
Jamison, 939 S.W.2d at 737; see also Baker Hughes Oilfield Operations, Inc. v.
Hennig Prod. Co., 164 S.W.3d 438, 443 (Tex. App.—Houston [14th Dist.] 2005,
no pet.) (“Any error of law made by the arbitrators . . . cannot be reviewed by a
court confirming the award.”). Thus, we hold UCS’s second and third grounds for
vacating the award to be without merit.
Next, UCS contends that the arbitrators made a gross mistake in refusing to
recognize disgorgement damages as measured by the value of the stolen trade
secret. The arbitration panel majority concluded that, even had UCS proven its
trade secret misappropriation claim, UCS did not prove that it sustained actual
damages, and any unjust enrichment damages were speculative. In Callahan, the
Texas Supreme Court considered whether a failure to award damages constitutes a
gross mistake. Callahan, 92 S.W.3d at 843–44. The arbitrator in Callahan
determined that the defendant was liable for the plaintiff’s defective driveway, but
failed to award damages despite the record evidence about the costs plaintiff
incurred to replace the driveway. Id. The Texas Supreme Court held as follows:
[A]n arbitrator does not violate the common law simply by failing to
award damages. See Teleometrics Int’l, Inc. v. Hall, 922 S.W.2d 189,
193 (Tex. App—Houston [1st Dist.] 1995, writ denied) (Gross
mistake, as a common law ground for setting aside an arbitration
award, is a mistake that implies bad faith or failure to exercise honest
judgment.).
 
Id. at 844. Likewise, we hold that the arbitrators in this case did not commit a
gross mistake sufficient to set aside the arbitration award by failing to award
damages to UCS. Thus, we hold UCS’s fourth ground for vacating the award to be
without merit.
Finally, UCS contends that the arbitrators made a gross mistake in finding
that its trade secret misappropriation claim is preempted by federal copyright law. 
According to UCS, the arbitrators based their decision on an “impossibly strained
interpretation” of Butler v. Continental Airlines, Inc., 31 S.W.2d 613 (Tex.
App.—Houston [1st Dist.] 2000, pet. denied), and, in any event, that decision is
not the majority view outside Texas. ADP asserts that Texas adheres to the
minority rule, and the arbitrators therefore properly followed Butler in holding that
trade secret misappropriation claims involving the wrongful copying of computer
software are preempted by federal copyright law. However, on cross-appeal, ADP
maintains that, should we disagree with the arbitrators’ conclusion, then ADP is
entitled to an injunction against UCS, as automatically provided for in the
arbitration decision.
As we have discussed, we simply may not review “alleged errors in the
application of substantive law by the arbitrators.” Jamison, 939 S.W.2d at 737; see
also Monday v. Cox, 881 S.W.2d 381, 385 (Tex. App.—San Antonio 1994, writ
denied) (“The courts are not permitted to second-guess the correctness of an
arbitrator’s decision on the merits.”). Rather, our review is confined to whether the
record indicates the arbitrators acted in bad faith or failed to exercise honest
judgment—not whether we agree or disagree with their application of the law. 
Here, the arbitrators relied on four Texas state and federal cases


 in deciding the
preemption issue, and we find nothing in the record indicating that the arbitrators
acted in bad faith or failed to exercise honest judgment. Thus, we hold UCS’s fifth
ground for vacating the award to be without merit and overrule the issue raised in
ADP’s cross-appeal.

Conclusion
          We conclude that the trial court should not have issued a discovery order
limiting the presentation of the evidence during the arbitration proceedings, but
that the order did not affect the arbitrators’ decision as to the merit of UCS’s
claims, and thus did not cause the rendition of an improper judgment. In addition,
we conclude that the arbitrators did not commit a gross mistake in finding that
UCS had failed to prove its trade secret misappropriation and breach of contract
claims. Accordingly, we affirm the judgment of the trial court confirming the
arbitration award. All pending motions are denied as moot.
 

                                                             Jane Bland
                                                             Justice
 
Panel consists of Chief Justice Radack and Justices Alcala and Bland.